IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JASON BERKOBEN,                          )
                                         )
        Plaintiff,                       )
                                         )        Civil Action No. 2:12-cv-1677
                v.                       )
                                         )        Judge Mark R Hornak
AETNA LIFE INSURANCE COMPANY,            )        Chief Magistrate Judge Lisa Pupo
                                         )        Lenihan
        Defendant.                       )
                                         )        ECF Nos. 21, 22
                                         )
                                         )
                                         )


## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No.
21) be granted in part and denied in part.  It is recommended that Plaintiff's Motion for Summary
Judgment be denied to the extent it seeks reversal and retroactive reinstatement of his long-term
disability benefits, and be granted in all other respects.   It is further recommended that
Defendant's Motion for Summary Judgment (ECF No. 22) be denied.  It is further recommended
that Aetna's decision to terminate Plaintiff's long-term disability benefits be vacated and the case
remanded to the plan administrator for further consideration in light of this Report and
Recommendation.

### II.    REPORT

Currently before the Court for disposition are cross-motions for summary judgment in
this ERISA action brought under 29 U.S.C. § 1132(a)(1)(B) for review of a termination of long-

1

term disability benefits.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1132(e).  Venue in this District is proper pursuant to 28 U.S.C. §§1391(b)(1) & (c)(2).

## A.    STATEMENT OF RELEVANT FACTS[1]

Plaintiff, Jason Berkoben, was employed by Dell, Inc. as a computer programmer.  As an employee of Dell, Berkoben was a participant in a long-term disability plan ("Plan"), which was insured by an insurance policy ("Policy") issued to Dell by Defendant, Aetna Life Insurance Company ("Aetna").  The Plan grants Aetna discretionary authority to "determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein."  (Berkoben Policy 074.)  The Policy and Plan further provide that Aetna "shall be deemed to have properly exercised such authority unless we abuse our discretion by acting arbitrarily and capriciously."  *Id.*  Aetna also reserved the "right to adopt reasonable policies, procedures, rules, and interpretations of this Policy to promote orderly and efficient administration."  *Id.*

Berkoben commenced employment with Dell on or about May 2, 2007, and at all material times, was a covered beneficiary under the Plan.  On or about March 3, 2010, Berkoben ceased working due to Schizoaffective Disorder and Bipolar Disorder.  (LTD 36-37, 322.)[2]  His treating psychiatrist at the time, Dr. Lekhwani, recommended that he stay home from work due

---

[1] The statements of fact submitted by the parties are undisputed for the most part.  The Court has not, however, reiterated in this section any statements labeled as "facts" which are, in effect, argument.  Also, to the extent Plaintiff has failed to cite to the record in support of a statement of fact, the court has likewise disregarded such statement, *see* LCvR 56.B.1, unless admitted by Aetna.

[2] "LTD" refers to record documents Bates-stamped "Berkoben LTD File."

to a "psychiatric illness." (STD 170.)[3] Berkoben informed Dell that his "illness is mental in nature." (STD 166.)

On July 15, 2010, Aetna notified Berkoben about the 24 month limitation on LTD benefits for mental illness. (LTD 18.)

Berkoben was initially approved for short term disability benefits for 180 days, and beginning on August 29, 2010, his claim for long-term disability (LTD) benefits was approved by Aetna. Dell's Group Long Term Disability Plan provides for payment of 60% of an employee's salary in the event of total disability, less offsets, including any Social Security benefits paid. On August 29, 2010, Berkoben began receiving from Aetna monthly LTD benefits in the amount of $3,230.00. On or about December 8, 2010, Berkoben was notified that he was approved for Social Security Disability Indemnity ("SSDI") benefits. Following receipt of the SSDI award, Berkoben's LTD benefits were offset by his SSDI benefits, and he received $2,080 in monthly LTD benefits from Aetna.

From August 2010 until June of 2012, Berkoben's treating psychiatrist, Mary Galonski, M.D., provided Aetna with multiple Behavioral Health Clinical Statements, contemporaneous office notes and disability forms, in which she consistently opined that Berkoben was unable to work due to Schizoaffective Disorder. (LTD 343-44, 350-51, 366-68, 369-71, 380-82, 403-05.) Aetna has never questioned that Berkoben suffers from Schizoaffective Disorder.

Throughout this time period, Berkoben's treatment consisted exclusively of medication management and individual psychotherapy. (LTD 145, 152, 155, 161-62, 171-72, 320-23, 326-29, 330-33, 337-42, 344, 346-48, 351-55, 376-79, 382, 405, 651, 658.) Medical records regularly refer to Berkoben as being treated for "schizoaffective disorder," "unspecified

---

[3] "STD" refers to record documents Bates-stamped "Berkoben STD File."

psychosis," and "observation of other suspected mental condition" with ICD-9 code numbers of 295.7, 298.9 and V71.09, respectively. (LTD 170, 321-22, 327, 331-32, 341, 347, 353, 357, 360, 363, 373, 377, 390, 396, 400, 597.) Also during this period, Berkoben was taking prescription anti-psychotic and mood stabilizing medications, including Abilify, Lithium, Risperdal and Zyprexa to control his symptoms of schizoaffective disorder (LTD 321, 327, 331, 340, 347, 353, 356, 362, 372, 376, 389, 395, 399), although at times he was not compliant with his medication as prescribed (LTD 321, 362, 396, 399). He also took Prilosec and was prescribe Zocor to treat high cholesterol. (LTD 372.)

Berkoben's symptoms were mental in nature, including episodes of major depression, auditory and visual hallucinations, delusions, flight of ideas, suicidal ideation, anxious and fearful thoughts, depressed mood and signs of psychosis and mania. (LTD 320, 389-402.) The only physical diagnoses indicated in the treatment notes or on physician statements completed for Aetna included GERD, high cholesterol, and pneumonia. (LTD 322, 332.) Berkoben confirmed that his disability was only due to his mental nervous diagnosis. (LTD 162.) He stated that his obstacles to returning to work consisted of "mental issues" and maintained that he had no physical impairments accompanying his mental illness. (LTD 129, 145.)

On March 2, 2012, Aetna again notified Berkoben of the impending 24 month limitation period for mental health conditions and informed him that the claim would be closed effective August 28, 2012. (LTD 292.)

Although Berkoben notified Aetna on May 14, 2014 that he had recently had a brain MRI and intended to forward it for review (LTD 172-73), the MRI had nothing to do with his schizoaffective or bipolar disorders, but rather, was prescribed for a problem he was having with black outs, and therefore, Berkoben never forwarded the MRI to Aetna. To date, Berkoben has

not produced any diagnostic studies, clinical findings, or other medical evidence showing that he personally suffers from "demonstrable, structural brain damage." Dr. Galonski's May 20, 2012 treatment note indicates that Berkoben would be required to show brain damage in order to continue to receive benefits (LTD 394),[4] and on June 6, 2012, Dr. Galonski stated that Berkoben had "no physical problems" (LTD 399).

On June 14, 2012, Berkoben's counsel submitted a representation and Intent to Appeal letter to Aetna, challenging the applicability of the 24 month mental health limitation and requesting a copy of the entire claims file. (LTD 579-82.) On July 9, 2012, Aetna consulted Dr. Elena Mendelssen, M.D., for clarification as to whether Berkoben's condition fell within the 24-month limitation period. (LTD 193.) Dr. Mendelssen opined that Berkoben's diagnosis of schizoaffective disorder did not appear on Aetna's Mental Nervous Limitations and Exclusions List, and therefore, was not excluded from the 24-month mental illness limitation. (LTC 193, 781-782.) Jeffrey Burdick, LCSW, from Aetna's Behavioral Heal Unit, reviewed this information and agreed with Dr. Mendelssen that Berkoben's diagnosis of schizoaffective disorder, ICD-0 code no. 295.7, did not appear on Aetna's Mental nervous Limitations and Exclusions List, and that the 24-month mental illness limitations applied. (LTD 186, 199.)

On July 10, 2012, Aetna sent a letter to Berkoben's counsel, informing him that Berkoben's LTD benefits were being terminated effective 8/28/12 ("termination letter"):

> A view of your file shows you became disabled on 3/2/2010. Your entitlement for LTD benefit (sic) began on 8/29/10, and we find you disabled thru 8/28/2012, the maximum 24 months end of benefit [ ] date, as described in the above contractual provision. The diagnosis of Schizoaffective Disorder is considered a mental health or psychiatric condition and therefore has 24 month max

---

[4] Specifically, Dr. Galonski noted: "His attorney hasn't gotten back yet about what tests are needed, the book just states has to show brain damage." (LTD 394.)

benefit duration. You will not be eligible for benefits beyond 8/28/2012.

(LTD 302.) In its termination letter, Aetna also advised Berkoben of his right to appeal and to submit additional information, including but not limited to, a detailed narrative report beginning 8/28/2012 through present; physician's prognosis; proof of confinement as an inpatient in a hospital or treatment facility; diagnostic studies; clinical findings; and any other relevant information or documentation specific to his schizoaffective disorder. (LTD 302.) Aetna also distinguished Berkoben's SSDI award based upon the difference in standard, lack of an explanation of the decision or information upon which it was based, and therefore, it was unable to give the SSDI award significant weight. (LTD 302.)

## Berkoben's Administrative Appeal

By letter dated September 20, 2012, Berkoben appealed Aetna's termination of his LTD benefits. (LTD 297-99.) Inasmuch as Aetna was not contesting Berkoben's disability status, the sole issue on appeal was whether Berkoben's disability, i.e., Schizoaffective Disorder, fell outside the Plan's 24 month limitation for a mental health disability. Berkoben attached to his appeal medical literature[5] and documentation, including a narrative summary from Dr. Galonski, to support his position that Schizoaffective Disorder and Bipolar Disorder are biological diseases of the brain, and thus fall outside Aetna's 24 month mental health limitation under the Plan.

---

[5] Berkoben attached the following medical literature and research articles to his appeal:
*Schizophrenia.com*
*Evidence That Schizophrenia is a Brain Disease (2009)*
*Structural Brain Deficits in Schizophrenia (1981)*
*The Effects of Schizophrenia on the Brain (2003)*
*Is Psychosis a Nerobiological Syndrome (2004)*
*Structural Brain Lesions in Schizophrenia—Magnetic Resonance Imaging on a Mid Field Magnet (2006)*
(LTD 459-566.)

(LTD 457-566.)  He did not provide Aetna with any diagnostic studies, clinical findings, or other medical evidence showing the *he* had demonstrable, structural brain damage.

In considering Berkoben's appeal, Aetna forwarded his file for further review to independent physicians specializing in Physical Medicine and Psychiatry.  (LTD 296.)  In particular, Aetna had the claims file reviewed by Stephen Gerson, M.D., board certified in psychiatry, on October 31, 2012, and Stuart Rubin, board certified in physical medicine, on October 25, 2012.  (LTD 307-311, 314-316.)  Aetna also requested a peer-to-peer telephonic consultation with Dr. Galonski, which was conducted by Dr. Rubin on October 11, 2012. Berkoben LTD File 000296.  Aetna also noted that the medical records submitted for its review indicated that Berkoben was receiving treatment for Schizoaffective Disorder and Bipolar Disorder, and Dr. Galonski observed that he appeared aware of his delusions and was struggling against them, was withdrawn and exhibited destructive thoughts towards his neighbors, and showed indications of cognitive issues.  *Id.*

Aetna denied Berkoben's appeal by letter dated November 2, 2012 ("final denial letter"), in which the following explanation is provided by the senior appeal specialist for Aetna:

> In your appeal request letter, submitted on behalf of your client, you provide your opinion that Mr. Berkoben's LTD benefits should not be subject to the 24 month maximum benefits, because his disabling condition [is] biological and not mental nervous condition.  We agree that there is emerging clinical evidence that the conditions of schizophrenia and bipolar illness have a biological basis.  However, the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association still classifies these conditions as mental nervous conditions.
>
> Based upon our review of the information you provided, and as explained in more detail above, we have determined that Mr. Berkoben's conditions continue to be classified as mental nervous conditions, as of March 2, 2010 and August 29, 2012.  Therefore,

> the original decision to terminate your client's LTD benefits, due
> to the policy maximum, effective August 29, 2012, has been
> upheld. . . .

(LTD 295-296.)

Berkoben exhausted the administrative remedies provided by the Plan. He then instituted the present action against Aetna on November 15, 2012 under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132(a)(1)(B), seeking LTD benefits from the Plan. The Court ordered the parties to file cross motions for summary judgment, along with a certified copy of the administrative record. The parties have complied and thus, the motions are ripe for review.

### B.     STANDARD OF REVIEW--CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.,* No. 05-4456, 184 Fed. Appx. 266, 270 (3d Cir. June 21, 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir. 1998)).

### C.   RELEVANT PLAN LANGUAGE

The Plan provides in relevant part:

> **Test of Disability**
>
> After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day that:
>
> - You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and
> - Your earnings are 80% or less of  your **adjusted predisability earnings.**
>
> ***After the first 24 months of your disability*** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related conditions.

(Berkoben Policy 85) (emphasis in original). The Plan further provides:

**Limitations Which Apply to Long Term Disability Coverage**

You will no longer be considered as disabled and eligible for long term monthly benefits after benefits have been payable for 24 months if it is determined that your disability is primarily caused by:

- A mental health or psychiatric condition, including physical manifestations of these conditions, but excluding conditions with demonstrable, structural brain damage; or
- Alcohol and/or drug abuse.

(Berkoben Policy 87) (emphasis in original).

### D. MEDICAL EVIDENCE & OTHER DOCUMENTS CONSIDERED BY AETNA ON APPEAL

#### 1. Report of Dr. Mary Galonski

In support of his appeal of the termination of his LTD benefits, Plaintiff submitted a letter dated September 5, 2012 to Aetna from his treating psychiatrist, Dr. Mary Galonski, M.D., who opines that "it is widely accepted within the medical community that schizophrenia and bipolar disorder, which are both present in Jason's case, are biological diseases of the brain." (LTD 458.) In support of her conclusion, Dr. Galonski observes that Plaintiff has been receiving treatment at the Family Counseling Center since March of 2010, where she sees him on a monthly basis. (LTD 457.) She further notes that Plaintiff "has diagnosis of schizoaffective disorder which is a condition where a person has all the criteria for schizophrenia as well as episodes meeting criteria for a mood disorder—in Jason's case that of a bipolar disorder." *Id.* Dr. Galonski further notes Plaintiff still exhibits symptoms consisting of:

visual and auditory hallucinations, paranoia ideas of reference, sleep disturbance, energy fluctuations with periods of very high

energy alternating with low energy periodically[;] . . . periods of taking on many projects simultaneously but being frustrated in not being able to concentrate to complete them effectively[;] . . . intermittent[ ] . . . suicidal and homicidal thoughts and still struggles regularly with anger and rage.

*Id.* Dr. Galonski also reported that Plaintiff "still is very impaired by his symptoms and periodically has to stay at home or leave a setting such as a store when his anger is flaring up or when delusional thoughts are strong." *Id.* With regard to his schizoaffective disorder, Dr. Galonski opines that Plaintiff "meets the DSM IV criteria for schizophrenia with his hallucinations and delusion being present as well as them resulting in significant social and occupational dysfunction and having duration of at least 6 months. These have been present even when his mood is stable. He also [meets] criteria for a mixed Bipolar illness with symptoms of mania & depression at the same time." (LTD 457-458.)

In addition, Dr. Galonski reported that Plaintiff has tried a number of prescription medicines to treat his conditions, including Zyprexa, which game him some improvement in psychotic symptoms while not completely alleviating them, but gave him unacceptable fatigue and weight gain; Lithium and Risperdal, which were of limited benefit; and Abilify, which actually heightened his anger. (LTD 457.)

Dr. Galonski then discusses the results of research on the relationship between schizophrenia and brain damage:

Much research has shown that brain scans of schizophrenics show results consistent with brain damage and dopamine over activity. In over 100 studies, Computerized axial tomography or CAT scans and magnetic resonance imaging or MRI scans show much larger ventricles in the brains of schizophrenics compared to controls which suggest diffuse neuronal damage and loss of cells. Positron emission tomography or PET scans show that brin metabolic activitiy in a psychotic episode is lower than that of controls. They also have shown that schizophrenics have more D2 receptors in

their brain than controls. Accumulating evidence from such studies suggest that psychosis, such as seen in schizophrenia, is associated with neuropathology of the frontal and temporal systems at both the gross anatomical and also the neuronal level. Several neurotransmitters appear involved in the symptoms that someone with schizophrenia present with including: dopamine serotonin, glutamate, N-methy-D-asparatate or NMDA and gamma-amino butyric acid.

(LTD 458.) Dr. Galonski goes on to opine:

Similarly with the bipolar portion of Jason's illness there is also ample evidence of brain alteration and dysfunction including in the manic phases, heightened activity of the left hemisphere prefrontal-cortical—sub cortical system that includes the caudate and anterior cingulate. In the depressed phase there appears to be attenuation of the orbito prefrontal area. Subjects with bipolar disorder exhibit lateral ventriculomegaly coupled with accompanying volumetric deficiencies in prefrontal cortical areas.

*Id.* Dr. Galonski then cites to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000) ("DSM-IV-TR"), which she submits "is psychiatry's current standard reference for all mental disorders[.]" *Id.* Dr. Galonski quotes the following passage from the DSM-IV-TR on associated laboratory findings with regard to schizophrenia:

In terms of functional brain imaging studies, hypofrontality (i.e., a relative decrease in cerebral blood flow, metabolism, or some other proxy for neural activity) continues to be the most consistently replicated finding. However, there is increasing recognition that functional abnormalities are unlikely to be limited to any one brain region, and most of the more recent studies suggest more widespread abnormalities involving cortical-subcortical circuitry.

*Id.* (quoting DSM-IV-TR at 305). In associated laboratory findings for manic episodes, Dr. Galonski finds that the DSM-IV-TR similarly reports that:

a variety of laboratory findings have been noted to be abnormal in groups of individuals with manic episodes compared with control subjects. . . . (including) polysomnographic abnormalities and increased cortisol secretion. There may be abnormalities involving the norepinephrine, serotonin, acetylcholine, dopamine, or gamma-

aminobutyric acid neurotransmitter systems."

*Id.* (quoting DSM-IV-TR at 359-60). Based on this research and the quoted passages from the DSM-IV-TR, Dr. Galonski concludes that "it is widely accepted within the medical community that schizophrenia and bipolar disorder, which are both present in Jason's case, are biological diseases of the brain." *Id.*

### 2.    Medical Research/Articles Attached to Dr. Galonski's Report

In support of her opinion, Dr. Galonski attached to her 9/5/12 Report the following medical literature and research articles:

> *Schizophrenia is a Disorder of the Brain*
> *Evidence That Schizophrenia is a Brain Disease (2009)*
> *Structural Brain Deficits in Schizophrenia (1981)*
> *The Effects of Schizophrenia on the Brain (2003)*
> *Is Psychosis a Neurobiological Syndrome (2004)*
> *Structural Brain Lesions in Schizophrenia—Magnetic Resonance*
> *Imaging on a Mid Field Magnet (2006)*

(LTD 459-566.) For example, in "Schizophrenia is a Disorder of the Brain," the author states that "[s]ince the early 1980s, with the availability of brain imaging techniques and other developments in neuroscience, the evidence has become overwhelming that schizophrenia and manic-depressive disorder are disorders of the brain[,]" and that "[i]ndividuals with schizophrenia . . . have a reduced volume of gray matter in the brain, especially in the temporal and frontal lobes. . . . Patients with the worst brain tissue loss also had the worst symptoms, which included hallucinations, delusions, bizarre and psychotic thoughts, hearing voices, and depression." Dr. E. Fuller Torrey, *Schizophrenia is a Disorder of the Brain,* http://www.schizophrenia.com/disease.htm. (ECF No. 1-11 at 2; LTD 509-514.) In addition, Dr. Torrey noted that individuals with schizophrenia "typically have enlarged ventricles in the brain, as demonstrated by over 100 studies to date." *Id.* (ECF No. 1-11 at 3.) Dr. Torrey further noted

that individuals with schizophrenia and manic-depressive disorder "have more neurological abnormalities . . . and have more neuropsychological abnormalities that impair their cognitive function, including such things as information processing and verbal memory[,]" and "[i]ndividuals with manic-depressive disorder have an enlarged amygdala and increased numbers of white matter hyperintensities." *Id.* (ECF No. 1-11 at 4.)

Similarly, the authors of "Evidence That Schizophrenia is a Brain Disease" report that "[d]ata from modern scientific research proves that schizophrenia is unequivocally a biological disease of the brain, just like Alzheimer's Disease and Bipolar Disorder. . . . modern non-invasive brain imaging techniques such as Magnetic Resonance Imaging (MRI) and Computerized Tomography (CT) have documented structural differences between schizophrenic and normal brains[, with] individuals with schizophrenia [showing] 25% less volume of gray matter in their brains." Rashmi Nemade, Ph.D. & Mark Dombeck, Ph.D., *Evidence That Schizophrenia is a Brain Disease,* Aug. 7, 2009, http://www.mentalhelp.net/poc/view_doc.php?type=doc&id=8812&cn=7. (ECF No. 1-11 at 14; LTD 459-460.)

The remaining articles submitted by Dr. Galonski in support of her opinion likewise support that brain damage is associated with schizophrenia. *See, e.g.,* Charles J. Golden, PhD, Benjamin Graber, MD, Jeffrey Coffman, MD, Richard A. Berg, PhD, David B. Newlin, PhD, & Solomon Bloch, MD, Abstract: *Structural Brain Deficits in Schizophrenia – Identification by Computed Tomographic Scan Density Measurements,* Sept. 1981, vol. 38, No. 9, available at http://archpsyc.jamanetwork.com/article.aspx?volume=38&issue=9&page=1014 (LTD 461-464) (CT scan levels showed lower density in anterior left-hemisphere of schizophrenic brains as compared to normal brains); Adina Cazaban, *The Effects of Schizophrenia on the Brain,*

http://serendip.brynmawr.edu/bb/neruo/neuro03/web2/acazaban.html, last modified 4/26/03 (ECF No. 11-1 at 18) (neurological studies show widespread abnormalities in structural connectivity of brains of schizophrenics); Daryl E. Fujii, PhD & Iqubal Ahmed, MD, *Is Psychosis a Neurobiological Syndrome?,* Can. J. Psychiatry, Vol. 49, No. 11, Nov. 2004 (LTD 483-88) (current evidence strongly indicates that schizophrenia and other psychosis are brain disorders); S.R. Parkar, R. Seethalakshmi, & H. Shah, *Structural Brain Lesions in Schizophrenia – Magnetic Resonance Imaging on a Mid Field Magnet*, Indian J. Radiol. Imag. 2006 16:3:299-301 (Aug. 2006) (LTD 489-91) (brain damage associated with schizophrenia has been established beyond doubt).

### 3.  Report of Dr. Stephen Gerson

In considering Plaintiff's appeal of its decision to terminate his LTD benefits, Aetna requested a physician medical record review by Dr. Stephen Gerson, board certified in psychiatry, which was conducted on October 31, 2012.  (LTD 307-311.)  In conducting this review, Dr. Gerson considered *inter alia* Plaintiff's medical records/office notes and Behavioral Health Clinician Statements  from Dr. Galonski, Aetna's 7/10/12 termination letter, Dr. Galonski's letter dated 9/5/12 with attached articles; and Plaintiff's 9/20/12 appeal letter. (LTD 308.)  Dr. Gerson did not examine or interview Plaintiff as part of his review.

After detailing Plaintiff's treatment history (LTD 308-310), Dr. Gerson addressed Aetna's referral question, "In your opinion, is the disabling condition a medical condition or mental/nervous?", to which  Dr. Gerson provided the following response:

> From the record the claimant's provider and attorney are claiming that the disease is neurobiological in basis, and therefore compensable.  There is emerging clinical evidence that schizophrenia and bipolar illness have a biological basis and furthermore, and ALSO there is emerging evidence that MOST

mental nervous conditions in the DSM-IV have a neurobiological basis.

Nonetheless, conventional nomenclature, i.e., the DSM-IV, is a compendium for diagnoses that are considered by those in the field to fall within the classification of "mental nervous." Though we have no clinical evidence to validate impairment from 8/30 /12 to 11/5/12, I would opine that up to 6/6/12 the claimant was impaired as his thoughts, feeling, and behavior were out of control. His diagnoses at that time where schizoaffective disease. This appears in DSM-IV as a mental nervous condition. Again, in my view although his condition has a neurobiological basis, by conventional nomenclature it is considered a "mental nervous" disorder within the DSM-IV nomenclature.

(LTD 310.)

### 4.    Report of Dr. Stuart Rubin

In addition, Aetna requested a physician medical record review by Dr. Stuart Rubin, board certified in physical medicine, in considering Plaintiff's appeal of its decision to terminate his LTD benefits. (LTD 314-316.) Dr. Rubin, who conducted his review on October 25, 2012, also considered *inter alia* Plaintiff's medical records/office notes and Behavioral Health Clinician Statements from Dr. Galonski, Aetna's 7/10/12 termination letter, Dr. Galonski's letter dated 9/5/12 with attached articles; and Plaintiff's 9/20/12 appeal letter, and did not examine or interview Plaintiff as part of his review. (LTD 315.)

On October 11, 2012, Dr. Rubin conducted a peer-to-peer telephonic consultation with Dr. Galonski, who reported during the consultation that Berkoben suffered from hallucinations, sedation, and poor concentration and was unable to work, but noted that pain was not an issue. (LTD 296, 315.)

After detailing Plaintiff's treatment history (LTD 315), Dr. Rubin addressed Aetna's referral questions. In response to the question, "Based on the provided documentation and

telephonic consultation, . . . provide a detailed description of the claimant's functional impairments, if any, from 8/28/12 through 10/24/2012", Dr. Rubin stated:

> From a musculoskeletal point of view, it is the opinion of this reviewer the claimant does not have functional impairments from 8/28/12 to 10/24/12. Review of the records does indicate the patient has a severe schizoaffective disorder which according to Dr. Galonski precludes working.

(LTD 315-316.)   In response to Aetna's second question, "In your opinion, in (sic) this claimant's condition a mental health condition, or a medical condition?", Dr. Rubin responded, "It is the opinion of this reviewer the claimant's condition is a mental health condition which can be considered a medical condition but not a musculoskeletal condition."  (LTD 316.)

### 5.    Aetna's Mental/Nervous limitations and Exclusions List

In its claim file, Aetna refers to its "Mental/Nervous Limitations and Exclusions List Effective 01/01/2008" ("Aetna's List" or the "List"), which appears to be a confidential, internally generated, document[6] that Aetna relied upon in determining that the 24-month mental/nervous limitation should be applied to Berkoben's LTD benefits.  (LTD 186, 781-784.) Aetna's List shows in Table 1, ICD-9 and the DSM-IV Codes, and Code Range Descriptions of the various mental disorders with recognized structural brain damage.[7]   For Schizophrenic Disorders/Schizophrenia, Aetna's List enumerates Code Nos. 295-295.4, 295.6, 295.90.  (LTD 782.)   The ICD-9 Code Range Descriptions provided by Aetna include the following Schizophrenic Disorders:

---

[6] Aetna appears to claim a registered copyright in the "Mental/Nervous Limitations and Exclusions List Effective 01/01/2008."  (LTD 781-784.)

[7] There is no indication as to what sources Aetna relied upon in determining which mental disorders should be included in this list as having recognized structural brain damage, thus excluding them from the 24-month limitation for a mental health or psychiatric condition.

Simple type (295.0)
Disorganized type (295.1)
Catatonic type (295.2)
Paranoid type (295.3)
Schizophreniform disorder (295.4)
Residual schizophrenia (295.6)
Unspecified schizophrenia (295.9)

*Id.* The DSM-IV Code Range Descriptions provided by Aetna include the following under Schizophrenia:

Disorganized type (295.10)
Catatonic type (295.20)
Paranoid type (295.30)
Schizophreniform disorder (295.40)
Residual type (295.60)
Undifferentiated type (295.90)

*Id.* According to Aetna, Dr. Galonski's primary disabling diagnosis is reported as 295.7 Schizoaffective Disorder, which does not appear on Aetna's List. As such, Jeffrey Burdick, LCSW from Aetna's Behavioral Health Unit ("BHU"), concluded on 6/11/12 that the 24-month mental nervous limit should be applied to Plaintiff's LTD claim. (LTD 186.)

Aetna's claim file further indicates that the decision was made to reach out to Dr. Elena Mendelssen for confirmation that Plaintiff's diagnosis is not considered an exclusion under Aetna's List. (LTD 197.) A note on 7/9/12 in Aetna's claim filed indicates that Dr. Mendelssen[8] "confirmed that the diagnosis does not appear on Aetna's Mental Nervous Limitations and Exclusions List[, and a]s such the 24 month mental nervous limit should be applied in this LTD claim." (LTD 193.)

---

[8] Dr. Mendelssen's name is spelled at least three different ways in the claims file. In its brief in support of summary judgment, Aetna refers to her as "Mendelssen," and so the Court assumes that this is the correct spelling her name.

E.      **DISCUSSION**

1.      **ERISA Standard of Review**

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 108 (2008). However, "ERISA does not specify the standard of review that a trial court should apply in an action for wrongful denial of benefits." *Post v. Hartford Ins. Co.*, 501 F.3d 154,160 (3d Cir. 2007). The Supreme Court has held that "a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[9] *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). In this case, the parties agree that the Plan grants discretionary authority to Aetna to determine eligibility for benefits or to construe the terms of the Plan. As such, the arbitrary and capricious standard is applied to Aetna's decision to terminate Berkoben's LTD benefits. *Estate of Schwing v. The Lilly Health Plan,* 562 F.3d 522, 525-26 (3d Cir. 2009).

Under the arbitrary and capricious standard of review, a court may overturn a decision of the plan administrator only if "it is without reason, unsupported by substantial evidence or

_____

[9] Section 3(21)(A) of ERISA provides the following definition of a fiduciary:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of [title 29].

29 U.S.C. § 1002(21)(A).

erroneous as a matter of law." *Miller v. Am. Airlines, Inc.,* 632 F.3 837, 845 (3d Cir. 2011).[10]

"A decision is supported by 'substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision.'" *Courson v. Bert Bell NFL Player Retirement Plan,* 214 F.3d 136, 142 (3d Cir. 2000) (quoting *Daniels v. Anchor Hocking Corp.,* 758 F.Supp. 326, 331 (W.D.Pa. 1991)).  Under this narrow standard, the reviewing court is not free to substitute its own judgment for that of the plan administrator.  *Vitale v. Latrobe Area Hosp.,* 420 F.3d 278, 386 (3d Cir. 2005) (citations omitted).

Where a structural or procedural conflict of interest is determined to exist, the "reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits . . . and . . . the significance of the factor will depend upon the circumstances of the particular case."  *Glenn,* 554 U.S. at 108 (citing *Firestone,* 489 U.S. 115).  Interpreting the Supreme Court's holding in *Glenn,* our court of appeals has determined that courts in this circuit should "continue to apply a deferential abuse-of-discretion standard of review in cases where a conflict of interest is present."  *Schwing,* 562 F.3d at 525.  In those situations, the court of appeals has instructed that courts "should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Id.* (citing *Glenn,* 554 U.S. at 115; other citations omitted) (finding "sliding scale" approach no longer valid after *Glenn*).  Moreover, the court of appeals determined that where an abundance of evidence exists to support the denial of the claim, "a structural conflict of interest or procedural irregularities would not serve to 'tip [ ] the scales in favor of finding that the [administrator]

---

[10] The arbitrary and capricious standard is essentially the same as the abuse of discretion standard.  *Miller,* 632 F.3d at 845 n. 2 (citing *Howley v. Mellon Fin. Corp.,* 625 F.3d 788, 793 n.

abused its discretion.'" *Miller,* 632 F.3d at 846 (quoting *Schwing,* 562 F.3d at 526).

### 2.    Structural and Procedural Conflicts of Interest

Where the entity making the determination as to whether an employee is eligible for benefits also pays the benefits out of its own pocket, "this dual role creates a conflict of interest[.]"  *Glenn,* 554 U.S. at 108.  Such a conflict is considered a structural conflict of interest. *Miller,* 632 F.3d at 845 ("The structural inquiry focuses on the financial incentives created by the way the plan is organized[.]") (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007)).[11]  The Supreme Court has recognized, however, that a structural conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  *Glenn*, 554 U.S. at 117.

Procedural conflicts of interest derive from irregularities in the process employed in denying benefits, looking at how the administrator treated the particular claimant. *Miller,* 632 F.3d at 845 (citing *Post,* 501 F.3d at 165).   This inquiry considers whether any alleged irregularities would give the court any reason to doubt the administrator's fiduciary neutrality. *Id.*  Procedural irregularities that can raise suspicion as to the administrator's neutrality include, but are not limited to:  "(1) a reversal of position without additional medical evidence; (2) self-

---

6 (3d Cir. 2010)).

[11] In *Schwing,* the court of appeals held that the "sliding scale" approach employed by it in *Post* was no longer valid after the Supreme Court's decision in *Glenn.*  562 F.3d at 525.  In *Miller,* the court of appeals noted that "even though our cases prior to *Glenn* are no longer good law to the extent they applied the 'sliding scale' approach, the various factors that our Court has historically evaluated must still be considered on arbitrary and capricious review."  632 F.3d at 845 n. 3

serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability[.]" *Post,* 501 F.3d at 164-65 (internal citations omitted). Other examples of procedural bias include: (1) failing to follow a plan's notification provisions regarding denial of benefits and conducting self-serving paper review of claimant's medical file, *Lemaire v. Hartford Life & Accident Ins. Co.,* 69 F. App'x 88, 92-93 (3d Cir. 2003); (2) self-serving selectivity in the administrator's use of medical expert's report, relying on favorable parts of report while discarding unfavorable parts without explanation, *Pinto v. CNA Life Ins. Co.,* 214 F.3d 377 (3d Cir. 2000);[12] and (3) denying benefits based on inadequate medical information for the crucial time period and an unreasonably lax investigation into plaintiff's claim, *Friess v. Reliance Std. Life Ins. Co.,* 122 F.Supp. 2d 566, 574-75 (E.D.Pa. 2000).

### 3. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment in his favor arguing that Aetna abused its discretion in its determination to terminate his LTD benefits. In support, Berkoben submits that a structural conflict of interest exists here, as Aetna is the same entity which funds and administers the benefit plan, which must be weighed as a factor in determining whether Aetna abused its discretion. (Pl.'s Summ. J. Br. at 6, ECF No. 28.) Berkoben further submits that multiple procedural irregularities occurred in Aetna's claims handling which resulted in Aetna abusing its discretion in denying Plaintiff's ongoing claim for LTD benefits. Plaintiff has identified three examples of Aetna's procedural irregularities: (1) Aetna ignored Dr. Galonski's

---

(citing *Schwing,* 562 F.3d at 526).

[12] *Pinto* is no longer good law to the extent it applied the sliding scale approach, *see* note 8, *supra,* but the Court may still consider the various factors in evaluating the administrator's decision under the arbitrary and capricious standard.

Report and attached literature confirming that present medical nomenclature acknowledges schizoaffective disorder and bipolar disorder are biological diseases of the brain; (2) Aetna ignored its own peer review psychiatrist's conclusion that Plaintiff's condition has a biological basis; and (3) Aetna ignored the terms of its own Policy. The Court will consider each of these purported conflicts of interest in turn.

**a.**    **Structural Conflict of Interest**

Berkoben submits that a structural conflict of interest exists here, as Aetna is the same entity which funds and administers the benefit plan. In response, Aetna acknowledges that its dual-role as both claim reviewer and claim payer may give rise to a concern about conflict of interest, but maintains that it is still entitled to the deference normally afforded under the arbitrary and capricious standard, citing *Miller,* 632 F.3d at 845. Moreover, Aetna submits that Plaintiff bears the burden of demonstrating not only that a conflict exists, but that it had a significant impact on the decision, balancing all of the relevant factors going into that decision, citing for support, *Eppley v. Provident Life & Acc. Ins. Co.,* 789 F.Supp. 2d 546, 569 (E.D.Pa. 2011). According to Aetna, the administrative record does not support Plaintiff's suggestion that its decision was affected by a conflict of interest. Rather, Aetna submits that it has put into place procedural safeguards and quality control measures to advance its practice and intention to review claims fairly, without regard to the manner in which the plan is funded, and to pay claims consistently and in accordance with the applicable benefit provisions, so that those claims which are payable under the Plan are paid and those which are not payble are not paid. Aetna further maintains that it has made tremendous efforts to wall off claims personnel from those interested in firm finances. In support, Aetna offers the Affidavit of Phillip Syphers, who is the Claim Manager, Disability and Absence Management, for Aetna. *See* Aff. of Philip Syphers, attached

to Def.'s Br. in Opp'n to Summ. J. (ECF No. 32-1).

The Court is satisfied that the structural conflict asserted here should have little if any impact on whether Aetna abused its discretion in terminating Plaintiff's LTD benefits. The Court has reviewed Mr. Syphers' affidavit and finds that it supports Aetna's position. Significantly, Plaintiff has not offered any argument or evidence to contradict Aetna's response or Mr. Syphers' affidavit.

### b.      Alleged Procedural Irregularities

.      The essence of Plaintiff's alleged procedural irregularities is that Aetna's decision to terminate his benefits was ingrained with self-serving selectivity and review of the medical evidence.  As to the first alleged procedural irregularity, Berkoben submits that Aetna singularly and wrongly focused on whether he suffered from a mental health disability without even considering if his illness was an exception to the 24-month mental/nervous limitation, which is clear from its termination letter dated July 10, 2012. Specifically, Berkoben points to the following excerpt from Aetna's termination letter:  "The diagnosis of Schizoaffective Disorder is considered a mental health or psychiatric condition and therefore has 24 month max benefit duration.  You will not be eligible for benefits beyond 8/28/2012."  (LTD 302.)  As further evidence of Aetna's improper focus in the 7/10/12 termination letter, Berkoben points to Aetna's request that he provide documentation of "specific physical limitations related to [his] condition" and, using standard, boilerplate language, that he provide "diagnostic studies . . . such as test results, X-rays, laboratory data, and clinical findings; . . ."  *Id.*  Based on these excerpts, Berkoben maintains that in July 2012, Aetna did not understand the singular issue comprising his entitlement to ongoing benefits—that his schizoaffective disorder and bipolar disorder, although considered mental/nervous conditions, are biological diseases of the brain, and therefore, fall

within the exception to the 24-month limitation.

With regard to his appeal, Berkoben submits that Dr. Galonski's narrative report, in which she opines that "it is widely accepted within the medical community that schizophrenia and bipolar disorder, which are both present in Jason's case, are biological diseases of the brain," and the medical literature attached in support, should have been more than sufficient to convince Aetna that it impermissibly terminated his benefits after 24 months solely on its stated basis that the "diagnosis of Schizoaffective Disorder is considered a mental health or psychiatric condition and therefore has 24 month max benefit duration." Nonetheless, Aetna denied his appeal on the same basis, stating that the DSM "still classifies these conditions as mental nervous conditions," again demonstrating that Aetna either did not understand or willfully chose to ignore the singular focus of his appeal—that his disability was an exception to the 24-month mental/nervous limitation.

The next procedural irregularity raised by Plaintiff is Aetna's self-serving selectivity in the use and interpretation of the report prepared by its peer review psychiatrist, Dr. Stephen Gerson. Berkoben contends that Aetna's complete misunderstanding of the singular issue in this case is illustrated both by what is contained in Dr. Gerson's report and notably by what was omitted. Aetna posed two questions to Dr. Gerson:

1.  Based on the provided documentation, and telephonic consultation, when applicable, provide a detailed description of the claimant's functional impairments, if any, from 08/30/12 through 11/05/12.

2.  In your opinion, is the disabling condition a medical condition or mental/nervous condition?

(LTD 307-310.) Berkoben submits that in light of Dr. Galonski's narrative report and attached medical literature, Aetna should have posed a third question to Dr. Gerson—in his opinion, does

the claimant have a mental health or psychiatric condition *characterized by demonstrable, structural brain damage*?  However, Aetna never asked Dr. Gerson this most probative question because, according to Berkoben, it is patently obvious that Aetna never fully grasped the singular issue on appeal.  Berkoben points out that Dr. Gerson actually concurred with Dr. Galonski's opinion, and if Aetna truly understood the issue on appeal, Dr. Gerson's concurrence should have compelled it to reverse its decision and reinstate his LTD benefits. Instead, Aetna supported its denial of his appeal only by stating that the DSM "still classifies these conditions as mental nervous conditions." (LTD 296.)  Berkoben maintains that he has never disputed that he suffers from a mental health disability, only that his mental health disability is characterized by demonstrable, structural brain damage. Berkoben contends that Aetna has failed to substantively respond to or address this issue.

The last procedural irregularity asserted by Plaintiff is that Aetna ignored the terms of its own policy.

In opposition, Aetna submits that Plaintiff's assertions of procedural irregularities have no basis in fact.  In support, Aetna argues that the administrative record shows that during its review of Plaintiff's claim for LTD benefits, all documents and information submitted by or on behalf of Plaintiff in support of his claim or otherwise obtained by Aetna were considered in reaching the claim decision.  Aetna further contends that Dr. Galonski's 9/5/12 report with attached medical literature was reviewed by two independent physicians, and that "Dr. Gerson's independent psychiatric review directly comments on emerging clinical evidence that most mental health conditions may have a biological basis, but concludes that the condition continues to be considered a mental health condition." Def.'s Br. in Opp'n to Summ. J. at 9-10 (ECF No. 32). Finally, Aetna submits that its final denial letter addresses the medical literature and Dr.

Gerson's opinion.   The Court finds that Aetna's argument is not convincing as it mischaracterizes the evidence and the contents of its final denial letter.

The fact that Aetna considered all of the documents and information submitted by Plaintiff as well as the peer review reports misses the mark.  The issue here is not whether Aetna failed to consider all of the evidence, but rather, whether Aetna's decision to terminate Plaintiff's benefits is supported by substantial evidence.

The starting point for this Court's deferential review is Aetna's 7/10/12 termination letter and its 11/2/12 final denial letter.  In the termination letter, Aetna informed Plaintiff that his diagnosis of schizoaffective disorder is considered a mental health or psychiatric condition and therefore, has a 24-month maximum benefit duration.   In the final denial letter, Aetna stated that because Plaintiff's schizoaffective disorder and bipolar disorder are classified as mental/nervous conditions by the DSM, his disabling condition was subject to the 24-month limitation and therefore, he was not entitled to LTD benefits after 8/28/12.   Although Aetna mentions that it requested independent peer reviews by physicians specializing in physical medicine and psychiatry, it does not inform Plaintiff of the results of these reviews; the final denial letter makes no mention of the medical literature or Dr. Gerson's opinion.   Aetna then states:

> In your appeal request letter . . . you provide your opinion that Mr. Berkoben's LTD benefits should not be subject to the 24 month maximum benefits because his disabling condition [is] biological and not mental nervous condition.  We agree that there is emerging clinical evidence that the conditions of schizophrenia and bipolar illness have a biological basis. However, the [DSM] still classifies these conditions as mental nervous conditions.

Final Denial Ltr. at 2 (LTD 296).  Aetna's conclusion is troubling in two respects.  First, Aetna misstates Plaintiff's counsel's position in his appeal request letter, and second, Aetna knows that

many mental disorders, which are classified as mental nervous conditions including schizophrenia, have recognized structural brain damage, and Aetna has excluded them from its 24- month limitation, as documented by its List.

Aetna incorrectly perceived Plaintiff's counsel's argument in his appeal request letter to be that Plaintiff's schizoaffective disorder was not subject to the mental health 24-month limitation because his disabling condition was a biological condition not a mental/nervous condition. Counsel's appeal request letter clearly indicates that Plaintiff was not maintaining that his disabling condition was not a mental health condition, but rather, that he was maintaining that his schizoaffective disorder was a mental health illness with an organic basis. Plaintiff's counsel specifically notes that the question of whether schizoaffective disorder is associated with neurochemical and structural brain deficits was posed to Dr. Galonski, and notes her response, which cites to numerous studies and the DSM-IV-TR, which show structural/neurobiological changes to the brain in individuals with schizophrenia and bipolar disorder. Appeal Request Ltr. 9/10/12 at 2-3 (LTD 298-299). Thus, counsel's appeal letter clearly puts Aetna on notice that Plaintiff is pursuing the exclusion to the limitation—where the mental condition is characterized by structural brain damage. Yet Aetna states that it is upholding its decision to terminate Plaintiff's benefits based on its conclusion that schizophrenia and bipolar disorder are still classified as mental/nervous conditions. This conclusion is unreasonable because it ignores Plaintiff's clearly stated position—that his disabling condition is characterized by structural brain damage and thus is excluded from the 24-month limitation period.

As to the second infirmity, Aetna's conclusion in its termination letter and final denial letter is contrary to its own internal List, which acknowledges that many mental/nervous conditions, including schizophrenia, have recognized structural brain damage, and excludes

those conditions from the 24-month mental health limitation. (LTD 781-000784.) Most importantly, Aetna's conclusion states that Plaintiff's disabling condition is still classified as a mental nervous condition and therefore is subject to the 24-month limitation. Although it appears from a review of the claim file that Aetna did ask Jeffrey Burdick, a LCSW in its BHU, and Dr. Mendelssen to confirm whether Plaintiff's diagnosis of schizoaffective disorder, ICD Code No. 295.7, fell within its internal List, no mention of these referrals or its internal List was made in either Aetna's termination letter or its final denial letter. This is critical as Aetna relied on both the referrals and its internal List to terminate Plaintiff's benefits. As such, Plaintiff contends that Aetna did not provide him with the specific reasons for its decision to terminate his benefits as required by Section 503 of ERISA, 29 U.S.C. §1133(1), which further demonstrates that Aetna abused its discretion.

Section 503 provides in relevant part that:

> [E]very employee benefit plan shall--
>
> > (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> >
> > (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. §1133(1) & (2). Also, as Plaintiff points out, the Secretary of Labor has promulgated regulations establishing the requirements of adequate notice under Section 503:

> (g) Manner and content of notification of benefit determination.
>
> > (1) Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide a claimant with written or

electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b−1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant--

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,

    (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

    (B) If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

29 C.F.R. § 2560.503-1(g)(1) (eff. 7/9/2001).  In *Grossmuller v. International Union, United Automobile Aerospace and Agricultural Implement Workers of America, UAW,* our court of

appeals opined:

> To afford a plan participant whose claim has been denied a reasonable opportunity for full and fair review, the plan's fiduciary must consider any and all pertinent information reasonably available to him. The decision must be supported by substantial evidence. The fiduciary must notify the participant promptly, in writing and in language likely to be understood by laymen, that the claim has been denied with the specific reasons therefor. The fiduciary must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence.

715 F.2d 853, 857-58 (3d Cir. 1983). Aetna responds it is not required to detail every piece of evidence upon which it relied in reaching its decision and that the DOL regulations require only that the specific reason or reasons for the denial be provided along with pertinent plan provisions and a description of information necessary to perfect the claim.[13] Aetna further responds that upon Plaintiff's request, it supplied him with a complete copy of his entire file, which contained all diary entries related to Dr. Mendelssen and Mr. Burdick, as well as their references to the List. However, Aetna does not indicate *when* it provided its claim file to Plaintiff.[14]

It is clear from the record that Aetna did not comply with the notice requirements of ERISA, as it (1) failed to inform Berkoben of one of the specific reasons for its termination of his benefits—reliance on its internal List and its referrals to Burdick and Mendelssen; (2) failed to inform him of certain critical evidence it relied upon—the internal List

---

[13] Aetna cites to 29 C.F.R. §2560.503(1)(f), but this citation is incorrect.

[14] The Court notes that Plaintiff's counsel requested a copy of Aetna's entire file on 6/14/12 by letter. (LTD 579-581.) Presumably, Aetna produced the file sometime after that date.

and the opinions of Burdick and Mendelssen; and (3) failed to provide him with the opportunity to examine this evidence and submit written comments or rebuttal evidence. Although Aetna is correct that it need not detail every piece of evidence upon which it relied in reaching its decision, failure to inform Plaintiff of evidence which is critical to its decision runs afoul of 29 C.F.R. §2560.503-1(g)(1). In particular, subsection (g)(1)(v)(A) requires the administrator to provide a plan participant with a copy of any internal policies or guidelines upon which it relies—Aetna's List falls within this subsection—with its denial letter. Aetna admits that it only provided a copy of its List to Plaintiff prior to the initial briefing schedule in this federal action. Def.s Reply Br. at 4 (ECF No. 34). Thus, Plaintiff had no opportunity to respond to it or provide any rebuttal evidence at the administrative review level. Moreover, because Aetna relied on the List in terminating Plaintiff's benefits, the regulation requires Aetna to provide the List.

Plaintiff also submits that aside from the generic, boilerplate language contained in the initial termination letter, Aetna failed to provide a description of what additional information or materials were needed to perfect his claim, in violation of Section 503 of ERISA. Aetna counters that Plaintiff cannot plausibly purport to have had no knowledge of the additional information necessary to perfect his claim, as the treatment notes from Dr. Galonski indicate that Plaintiff had actual knowledge of the type of information he needed to submit to support his claim because he told Dr. Galonski that he would need to produce test results or show brain damage in order to continue receiving benefits. The fact of the matter is ERISA and DOL regs require the administrator to inform the claimant of what information is needed to perfect his claim, and boilerplate language that has no application to the particular disability claim does not satisfy this requirement. Especially where, as in this case, Aetna failed to inform Plaintiff of its reliance on its exclusions List and its consults with Dr. Mendelssen and Mr. Burdick.

Thus, Aetna's failure to comply with Section 1133 is probative of whether it abused its discretion in terminating Plaintiff's benefits. *Kao v. Aetna Life Ins. Co.,* 647 F.Supp. 2d 397, 410 (D.N.J. 2009) (citing *Vaughn v. Vertex, Inc.,* No. 04-1742, 2004 WL 3019237, at *5-*8 (E.D.Pa. Dec.29, 2004)); *see also Schwing,* 562 F.3d at 526 (the relevant factors include "procedural concerns about the administrator's decision making process").

Next, in further response to Plaintiff's alleged procedural irregularities, Aetna submits that Dr. Galonski's 9/5/12 report with attached medical literature was reviewed by two independent physicians, and "Dr. Gerson's independent psychiatric review directly comments on emerging clinical evidence that most mental health conditions may have a biological basis but concludes that the condition continues to be considered a mental health condition." Def.'s Br. in Opp'n Summ. J. at 9-10, ECF No. 32. Aetna further argues that similarly, its final denial letter on appeal addresses the medical literature and Dr. Gerson's opinion. Aetna's argument is not convincing as it mischaracterizes Dr. Gerson's opinion and the contents of its final denial letter.

First of all it is important to consider the context of Dr. Gerson's opinion—it was provided in response to the following question from Aetna: "In your opinion, is the disabling condition a medical condition or mental/nervous?" That inquiry is asking Dr. Gerson to opine as to whether Plaintiff's schizoaffective disorder or bipolar disorder is a disabling *medical* condition, which is not subject to the 24 month limitation for mental health or psychiatric conditions, or whether it is a mental/nervous condition, which is subject to the 24-month limitation. Thus, when Dr. Gerson opined that "schizoaffective disease . . . appears in DSM-IV as a mental nervous condition. Again, in my view although his condition has a neurological basis, by conventional nomenclature it is considered a 'mental nervous' disorder within the DSM-IV nomenclature[,]" he was merely confirming that the DSM-IV classifies schizoaffective

33

disorder as a mental/nervous condition, as opposed to a medical condition. (LTD 310.) To the extent Aetna construed Dr. Gerson's statement to mean that because his condition was mental nervous, he had no structural brain damage, that determination is an unreasonable interpretation of his statement, as Aetna did not ask him that question.

Second, Aetna also misstated Dr. Gerson's opinion with regard to his comment on Dr. Galonski's report and attached medical literature. What Dr. Gerson actually stated was that "[Plaintiff's treating psychiatrist] and attorney are claiming that the disease is neurobiological in basis, and therefore compensable. There is emerging clinical evidence that schizophrenia and bipolar illness have a biological basis and furthermore, and ALSO there is emerging evidence that MOST mental nervous conditions in the DSM-IV have a neurological basis." *Id.* (emphasis in original). In the Court's view, Dr. Gerson actually concurs with Dr. Galonski's opinion.

The Court also finds that Aetna's failure to explain why it gave less weight to Dr. Galonski's report and medical literature, especially in light of Dr. Gerson's concurrence with her opinion, as well as its failure to ask Dr. Gerson an appropriate follow up question—whether Plaintiff's disabling conditions are characterized by structural brain damage—are indicative of self-serving selectivity and thus show evidence of bias. Dr. Galonski is a psychiatrist who had been treating Plaintiff on a monthly basis for the better part of two years when she was asked to submit her narrative report in support of Plaintiff's administrative appeal. Neither Mr. Burdick nor Dr. Mendelssen contradict Dr. Galonski as they were not asked to opine on the very issue that Dr. Galonski opined. Thus, the administrative record does not contain any *medical* evidence

that undermines Dr. Galonski's report.[15]

Thus, the Court finds that there is evidence of bias from the procedural irregularities noted above which supports the conclusion that Aetna abused its discretion in terminating Plaintiff's LTD benefits. The Court will take these irregularities into consideration in analyzing Aetna's arguments in support of its summary judgment motion.

### 4.  Aetna's Motion for Summary Judgment

In support of its motion for summary judgment, Aetna advances several arguments. First, Aetna argues that Plaintiff bears the burden of establishing he is disabled, including proof that his disability is not mental where the plan, as in this case, limits coverage for mental disability. Aetna submits that in response to its termination letter, where it invited Plaintiff to submit additional evidence, including but not limited to a detailed narrative outlining specific physical limitations, proof of confinement for his condition, diagnostic studies, or any other relevant information, Plaintiff submitted extremely limited evidence in the form of psychotherapy notes and a letter from his treating psychiatrist, Dr. Galonski, along with medical literature "discussing the existence of a possible biological basis for schizophrenia and bipolar disorder." Def.'s Br. in Supp. of Summ. J. at 11 (ECF No. 25). Aetna further contends that Plaintiff failed to submit any evidence that he suffered from any physical impairment, that he was ever diagnosed with structural brain damage or that he actually suffered from structural brain damage. In contrast, Aetna submits that the administrative record contains ample evidence that Plaintiff's diagnoses of schizoaffective disorder and bipolar disorder are mental or psychological conditions. While this latter statement appears to be true, as discussed above, the classification of his disabling

---

[15]The Court finds that Aetna's List does not constitute medical evidence as no medical, psychiatric, or other authority is provided to show how Aetna determined what mental disorders

conditions as mental nervous is not determinative of the outcome here.

For the first time, Aetna attempts to support its decision to terminate Plaintiff's benefits by arguing, in this federal action, that Plaintiff failed to submit evidence that he himself has structural brain damage. However, Plaintiff's failure to provide such evidence was not one of the stated reasons given by Aetna for terminating his benefits, nor did Aetna provide any information to Plaintiff as to what proof would be acceptable to prove structural brain damage. Nonetheless, Aetna submits that Dr. Galonski's treatment notes on 5/20/12 state that Plaintiff would be required to show brain damage in order to continue to receive benefits. Def.'s Br. in Supp. of Summ. J. at 12 (ECF No. 25). This notation also shows that it was unclear what proof would be necessary to show structural brain damage associated with his schizoaffective disorder and bipolar disorder—Dr. Galonski's note stated: "His attorney hasn't gotten back yet about what tests are needed, the book just states he has to show brain damage." (LTD 394.) The record does not show that Aetna provided any information to Plaintiff as to what proof would be acceptable to prove structural brain damage.

On the other hand, Dr. Galonski's Report and the supporting medical literature did more than *suggest* a possible biological connection with schizophrenia, as Aetna argues. Indeed, Aetna recognizes such a connection in its own List, which identifies "mental disorders with recognized structural brain damage which are NOT subject to the 24 month benefit limitation." (LTD 781-784.) Included on that list are conditions that the DSM-IV classifies at mental nervous conditions, including schizophrenia. In her 9/5/12 Report, Dr. Galonski notes that schizoaffective disorder "is a condition where a person has all the criteria for schizophrenia as well as episodes meeting the criteria for a mood disorder—in [Plaintiff]'s case that of bipolar

to include on the List.

disorder." (LTD 457.) Thus, it is perplexing as to why schizoaffective disorder is not included on Aetna's List.

In defending its decision, Aetna attempts to down play Dr. Galonski's Report by again inserting words to suggest the tentativeness of her opinion and the supporting medical literature. *See* Def.'s Br. in Supp. of Summ. J. at 13 (describing the medical literature as "discussing a *possible* biological connection to schizophrenia" when in fact the literature found a biological connection was determined to exist). Aetna then attempts to fault Dr. Galonski for not providing evidence that Plaintiff's diagnoses were caused by or involved structural brain damage, which statement is clearly contradicted by Dr. Galonski's report. Perhaps realizing the fallacy of that argument, Aetna then argues that Dr. Galonski never opined that Plaintiff himself suffered from brain damage, nor did she diagnose him with brain damage or any other brain abnormalities or structural deficit, nor did she refer him to other specialists, such as neurologists or neuropsychologists. While Aetna's argument may have some superficial appeal, it is only a red herring.

Aetna never informed Plaintiff that it was terminating his benefits because he failed to submit evidence that he himself had structural brain damage. Aetna cannot ask this Court to uphold its decision on a basis not relied upon to terminate benefits at the administrative level, nor previously disclosed to Plaintiff and only discovered by Plaintiff in this federal action when preparing his motion for summary judgment.[16]

Moreover, it appears that Aetna does not require such evidence for mental disorders

---

[16] Plaintiff contends that he requested Aetna's entire file in 2012 but never received the notes regarding Dr. Mendelssen or Mr. Burdick, or the List, until he was preparing his summary judgment motion.

identified on its List, which includes schizophrenia. Interestingly, both Dr. Galonski and the DSM-IV-TR, upon which Aetna relies, confirm that to diagnose a patient with schizoaffective disorder, the individual must have symptoms that meet Criterion A for schizophrenia. (LTD 457; DSM-IV-TR at 319, 323.) Schizoaffective disorder is defined in the DSM-IV-TR as a "disorder in which a mood episode and the active-phase symptoms of Schizophrenia occur together and were preceded or are followed by at least 2 weeks of delusions or hallucinations without prominent mood symptoms." DSM-IV-TR at 298. Aetna's List, an internally generated document, provides a list of exclusions to the mental/nervous limitation for every type of schizophrenia but schizoaffective disorder. This appears to be arbitrary, as schizophrenia is listed as an exclusion from the 24-month limitation while schizoaffective disorder, which is a form of schizophrenia, is not. There is no explanation in the administrative record as to how Aetna determined what mental/nervous conditions to include on its List and which ones to omit. More importantly, the List undermines Aetna's reason for denying Plaintiff's claim—all of the mental disorders listed on Aetna's List are mental/nervous conditions, but the sole reason Aetna provided to Plaintiff for terminating his benefits and denying his appeal was that his mental disorder was a mental/nervous condition.

Next, Aetna argues that it was not required to credit the opinion of Plaintiff's treating physician over that of its own medical consultants, and it weighed the evidence, including any contradictory medical records from Plaintiff and his treating physician, in following the terms and conditions of the Plan. The problem with this argument is that Aetna perceived Dr. Galonski's report and attached medical literature to be at odds with the reports of Dr. Gerson and Dr. Ruban, when in fact, neither report contradicts Dr. Galonski's opinion and Dr. Gerson's

report actually concurs with Dr. Galonski' opinion.[17]

In addition, Aetna's consultation with Dr. Mendelssen and Mr. Burdick consisted of a telephone conversation in which they were asked whether Plaintiff's diagnosis of schizoaffective disorder, ICD Code No. 295.7, appears in Aetna's List. No report was generated by either Dr. Mendelssen or Mr. Burdick, and only a notation appeared in the claims administrator's file. Neither Dr. Mendelssen nor Mr. Burdick was asked to opine whether the medical literature attached to Dr. Galonski's Report supported Plaintiff's position that schizoaffective disorder is characterized by structural brain damage, or why schizoaffective disorder was not included on the List, when schizoaffective disorder actually has a schizophrenia component. Thus, merely asking Dr. Mendelssen and Mr. Burdick to confirm the absence of ICD Code No. 295.7 from Aetna's List does not contradict, in any way, Dr. Galonski's Report, or for that matter, the report of Dr. Gerson.

Thus, the only evidence that supports Aetna's decision to terminate Plaintiff's benefits is its own List, but it failed to specify that as a reason for its decision to terminate benefits and failed to provide Plaintiff with a copy of the List with its termination letter. Although the Plan gives Aetna the authority to establish policies and guidelines for administering claims and determining eligibility, a procedural irregularity exists where the administrator relies on an internal policy that lacks any apparent medical, psychiatric, or scientific authority for which

---

[17] Aetna misstates Dr. Gerson's findings, by intentionally inserting the word "might" before "have" to suggest some tentativeness to his opinion when, in fact, there is none. *See* Def.'s Br. in Supp. of Summ. J. at 6 (ECF No. 25). Dr. Gerson actually opined that "[t]here is emerging clinical evidence that schizophrenia and bipolar illness *have* a biological basis and . . . ALSO there is emerging evidence that MOST mental nervous conditions in the DSM-IV *have* a neurobiological basis." (LTD 310.) And Dr. Gerson concluded that "in my view, although his condition *has* a neurobiological basis, by conventional nomenclature it is considered a 'mental nervous' disorder within the DSM-IV nomenclature." *Id.*

mental disorders are included on the exclusions list and which are not. Thus, Aetna's List cannot be construed as "medical evidence," and Aetna's reliance on it, while excluding the unfavorable portions of the psychiatric opinions of Drs. Galonski and Gerson, the medical literature and the DSM-IV, was unreasonable.

Finally, Aetna posits that where, as here, the plan grants the administrator discretion to interpret the plan's terms and conditions, courts have upheld the administrator's reasonable interpretation of similar mental illness provisions, even where a different interpretation exists. In support, Aetna cites a number of cases, none of which is binding on this Court and, in any event, all are distinguishable factually from the case at bar. Moreover, even though the courts may have been interpreting similar mental illness provisions, the decisions in those cases are very fact specific, and therefore, are not dispositive here. Importantly, in four of the cases cited by Aetna, the plan did not have an exclusion to the 24-month limitation, like the one in this case, for mental conditions with demonstrable structural brain damage, and therefore, only involved a determination of whether the disabling condition was a mental versus medical condition. *See, e.g., Fischer v. Liberty Life Assur. Co. of Boston,* 576 F.3d 369, 376-77 (7th Cir. 2009); *Katsanis v. Blue Cross & Blue Shield Ass'n,* 803 F.Supp. 2d 256, 262 (W.D.N.Y. 2011); *Seaman v. Mem. Sloan Kettering Cancer Ctr.,* No. 08 Civ. 3618 (JGK), 2010 WL 785298, *15 (S.D.N.Y. Mar. 9, 2010); *Ernest v. Metropolitan Life Ins. Co.,* 291 F.Supp. 2d 1327 (M.D.Fla. 2003).

Several other cases cited by Aetna merit brief discussion. Although in *Hurse v. Hartford Life & Accident Insurance Co.*, 77 F. App'x 310 (6th Cir. 2003), the administrator was asked to decide whether the claimant's disability stemmed from mental illness or from structural brain damage, that is where the similarity ends with the case at bar. In *Hurse,* the claimant suffered from a number of conditions, some medical (cerebral vascular accident (CVA), diabetes mellitus,

hypertension) and some mental (dementia). Plaintiff argued that he was disabled due to organic brain disorder. The administrator obtained review by several specialists, all of whom were asked to opine as to whether there was any evidence of structural brain damage, and they determined that the claimant did not suffer from structural brain damage.

In *Veryzer v. American International Life Assurance Co. of New York,* No. 09 Civ. 8229 (RMB), 2012 WL 6720932, *3-*4 (S.D.N.Y. Dec. 27, 2012), the claimant argued that his symptoms were the result of structural brain damage, not mental illness, and were attributable to Hepatitis A and B vaccinations, in particular, to a mercury-based preservative ingredient. The administrator found that the claimant failed to provide credible evidence that his disability arose from demonstrable, structural brain damage. As in *Hurse,* the administrator in *Veryzer* obtained substantial medical evidence specifically on the issue of whether the claimant had structural brain damage, and clinical tests definitively showed an absence of mercury poisoning. Thus, *Veryzer* is clearly distinguishable from the case at bar.

The last case cited by Aetna is *Doe v. Hartford Life and Accident Insurance Co.,* Civ. A. No. 05-2512 (JLL), 2008 WL 5400984 (D.N.J. Dec. 23, 2008). Aetna contends that *Doe* involved a mental illness limitation provision nearly identical to the one at issue here "on strikingly similar facts." The Court disagrees. The disabling condition at issue in *Doe* was bipolar disorder, which the claimant argued was not a mental illness because it had a biological basis. The only evidence submitted by the claimant in support of his position was a letter by his physician, who had previously described his condition as a psychiatric illness, but later opined that it was not. That evidence stood in stark contrast to the opinions of another treating physician and a reviewing psychiatrist, both of whom opined that bipolar disorder is a psychiatric condition. Another distinguishing factor in *Doe* was that the administrator was required to

interpret the policy's definition of mental illness—"[A]ny psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage[,]" *id.* at *3, to determine whether the claimant's bipolar disorder was a mental illness, and thus limited to 24 months of benefits. Here, Aetna's Plan does not include any definition of mental illness. Importantly, the exclusion for structural brain damage in *Doe* was found in the definition of mental illness, not with the provision limiting benefits to 24 months, like in the present matter. Even more significant is the fact that the court in *Doe* specifically noted that the claimant did not assert that his condition fell within the exception for demonstrable structural brain damage. *Id.* at *10. Thus, the court's opinion, in the alternative, that the claimant had not submitted any evidence that he personally had structural brain damage was dicta.

As to whether Plaintiff should be required, on remand, to produce evidence that he himself has structural brain damage, at least one court has held that such proof is not required where there is no test that reveals or confirms the diagnosis. *Fitts v. Unum Life Ins. Co. of Am.,* Civ. A. No. 98-00617 (HHK), 2007 WL 1334974, *8 (D.D.C. May 7, 2007). In *Fitts,* the administrator terminated the claimant's LTD benefits after 24 months under a provision limiting benefits for disabilities due to mental illness. The claimant was disabled due to bipolar disorder. A psychiatrist who was considered the leading expert on bipolar disorder opined that "bipolar patients suffer 'brain damage . . . as a result of the episodes, particularly depressive episode where you get secretion of a lot of steroids that are toxic to the brain. And over time, the average bipolar patient loses intellectual function.'" *Id.* at *5. The administrator argued that the claimant did not have bipolar disorder because there were no brain studies showing changes in her brain. *Id.* at *8. However, the administrator conceded that bipolar disorder '"cannot be diagnosed with

a brain scan.'" *Id.* The district court rejected the administrator's argument, holding that "[a]lthough bipolar disorder is an organic brain disorder associated with physiological changes in the brain, . . . there is no test that reveals or confirms the diagnosis of bipolar disorder, and [the claimant] cannot be required to produce what does not exist in order to prevail." *Id.* The district court concluded, based on the reports and opinions of medical experts, both treating and examining psychiatrists, that the claimant suffered from bipolar disorder. In determining whether the claimant was disabled by her bipolar disorder, the court considered the following testimony of the leading expert on bipolar disorder, which has some relevance here:

> Dr. Goodwin testified that, over time, bipolar disorder is associated with significant deterioration in general intellectual abilities in some bipolar patients. This is confirmed by longitudinal studies that track individuals and groups of individuals over time. The loss of cognitive function and deterioration of the brain are documented in the Neurophysiology chapter of *Manic Depressive Illness* and in hundreds of studies. "[T]here is brain damage that goes on as a result of the episodes, particularly depressive episode where you get secretion of a lot of steroids that are toxic to the brain. And over time, the average bipolar patient loses intellectual function."

*Id.* at *12 (internal citations to record omitted). In the case at bar, Dr. Galonski opined that Plaintiff is disabled due to schizoaffective disorder and bipolar disorder. Dr. Goodwin's testimony in *Fitts* lends credence to Dr. Galonski's opinion that individuals with bipolar disorder have structural brain damage. Moreover, it is not clear whether any clinical test can confirm the presence of structural brain damage at this stage of the disease. Therefore, such evidence may not be available. This issue should be considered on remand.

Accordingly, the Court finds that Aetna's decision to terminate Plaintiff's LTD benefits is not supported by substantial evidence as no reasonable person could agree with Aetna's decision based on the evidence in the administrative record. Thus, the Court concludes that

Aetna abused its discretion in terminating Plaintiff's benefits.

### 5. Remedy

Finally, the Court must determine the appropriate remedy for an improper termination of benefits under Section 502(a)(1)(B)—remand to the plan administrator to provide the claimant with a full and fair review of the claim, or award retroactive reinstatement of benefits. The U.S. Court of Appeals for the Third Circuit addressed this issue recently in *Miller*:

> In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination. *See Hackett*, 315 F.3d at 776. As such, an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded. In a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled. To restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion. In the termination context, however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, benefits should be reinstated to restore the status quo.

632 F.3d at 856-57. Applying that reasoning to the case at bar, reinstatement would appear to be warranted here because Aetna terminated Plaintiff's benefits. However, in light of the procedural irregularities noted above with regard to Section 503 notice, and it is not clear, even if Plaintiff meets the exclusion for structural brain damage, whether he can show that he is disabled under the "any reasonable occupation" standard, the Court recommends that Aetna's decision be vacated and this case be remanded to the plan administrator for further consideration in light of this Court's report and recommendation.

### 6. Plaintiff' Request for Attorney's Fees

Plaintiff claims that as a result of Aetna's unreasonable, arbitrary and capricious termination of his LTD benefits, for which he was required to obtain counsel to have his benefits reinstated, he is entitled to recover reasonable attorneys' fees and costs pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. §1132(g)(1). This section provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *Id.* Pursuant to Section 1132(g)(1), "the defendant in an ERISA action usually bears the burden of attorney's fees for the prevailing plaintiff . . . thus 'encourag[ing] private enforcement of the statutory substantive rights, whether they be economic or noneconomic, through the judicial process.'" *Brytus v. Spang & Co.,* 203 F.3d 238, 242 (3d Cir. 2000) (quoting Report of the Third Circuit Task Force, Court Awarded Attorney Fees 15 (Oct. 8, 1985), *reprinted at* 108 F.R.D. 237, 250).

Plaintiff sets forth five policy factors that the Court must consider in determining whether to make any award of counsel fees under Section 1132(g)(1), as stated in *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir. 1983), but does not provide any analysis or argument to show that the policy factors weigh in favor of awarding him a reasonable attorney's fee in this case. Therefore, the Court declines to award attorney's fees and costs at this time, but will allow Plaintiff an opportunity to file a separate motion for attorney's fees with appropriate supporting argument and documentation, and a response thereto, if the District Judge assigned to this case enters an order in his favor on his motion for summary judgment.

### F. CONCLUSION

For the reasons set forth above, the Court concludes that Aetna abused its discretion in terminating Plaintiff's LTD benefits, and therefore, recommends that Aetna's decision to

terminate his benefits be vacated and the case remanded to the plan administrator for further consideration in light of this Report and Recommendation. Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment (ECF No. 21) be granted in part and denied in part. It is recommended that Plaintiff's Motion for Summary Judgment (ECF No. 21) be denied to the extent it seeks reversal and retroactive reinstatement of his LTD benefits, and be granted in all other respects. It is further recommended that Defendant's Motion for Summary Judgment (ECF No. 22) be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: February 21, 2014                    BY THE COURT:

_____
LISA PUPO LENIHAN
Chief U. S. Magistrate Judge


cc:      All Counsel of Record
         *Via Electronic Mail*